# No. 13-5223

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

**SHAKER ABDURRAHEEIM AAMER, detainee, Camp Delta, and SAEED AHMED SIDDIQUE, next friend of Shaker Abdurraheem Aamer,**

*Petitioners—Appellants,*

*v.*

**BARACK H. OBAMA, et al.,**
*Respondents—Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
CASE NO. 04-2215 (RMC)

CONSOLIDATED WITH 13-5224, 13-5225, 13-5276

———————————————

# MOTION TO INTERVENE

———————————————

**JON B. EISENBERG**
1970 BROADWAY, SUITE 1200
OAKLAND, CALIFORNIA 94612
(510) 452-2581 · FAX: (510) 452-3277

**REPRIEVE**
CORI CRIDER
CLIVE STAFFORD SMITH
TARA MURRAY
P. O. BOX 72054
LONDON EC3P 3BZ
UNITED KINGDOM
011 44 207 553 8140

ATTORNEYS FOR PETITIONERS AND APPELLANTS **SHAKER AAMER, AHMED BELBACHA, NABIL HADJARAB & ABU WA'EL (JIHAD) DHIAB,** AND FOR PROPOSED INTERVENOR **IMAD ABDULLAH HASSAN**

Imad Abdullah Hassan hereby moves to intervene in the above-captioned consolidated appeals. Counsel for appellants and Hassan have conferred with counsel for the defendants-appellees, who stated that they do not have a position in advance of the filing of the motion to intervene, but will state their position in a responsive filing.

Hassan is a detainee at Guantánamo Bay. His petition for a writ of habeas corpus is pending in the United States District Court for the District of Columbia. *See Imad Abdullah Hassan v. George W. Bush, et al.*, Civ. No. 04-1194 (UNA).

Hassan has been on hunger strike nearly continuously since 2007. He is currently on hunger strike and is being force-fed against his will. *See* attached Dec'l of Clive A. Stafford, at ¶¶ 6, 8. The purpose this motion is to assert and protect Hassan's rights and preserve this Court's jurisdiction should the Court otherwise be inclined to issue a mootness disposition of the four pending appeals due to the Government's removal of appellants' designation as hunger strikers. Assuming intervention is allowed, Hassan adopts the merits briefs filed by the present appellants.

Intervention in these appeals is governed by the criteria set forth in Fed. R. Civ. P. 24. *International Union v. Scofield*, 382 U.S. 205, 217 n.10

(1965); *see NML Capital, Ltd. v. Republic of Argentina*, No. 12-105 (2d Cir. Nov. 28, 2012) (order granting motion "for leave to intervene as interested non-parties for the purpose of appealing orders entered by the district court . . . and for the purpose of seeking a stay pending appeal"); *cf. Nuesse v. Camp*, 385 F.2d 694, 699-701 (D.C. Cir. 1967) (intervention to avoid creation of adverse precedent); *Wolpe v. Poretsky*, 144 F.2d 505, 507-08 (D.C. Cir. 1944) (intervention directed after final judgment in the trial court for purpose of pursuing appeal abandoned by existing parties).

This motion is based on Fed. R. Civ. P. 24(a)(2), which provides for *intervention of right* where the moving party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Hassan meets this standard because, as a hunger striker who is currently being force-fed, enforcement of his rights to refuse medical treatment and to religious free exercise likely depends on the outcome of these appeals, and the existing appellants can no longer adequately represent his interests if their appeals are dismissed as moot. The motion is timely, as it is filed shortly after appellees

announced the "recent factual development" on which their suggestion of mootness is based.

Alternatively, this motion is also based on Fed. R. Civ. P. 24(b)1)(B), which provides for *permissive intervention* where the moving party "has a claim or defense that shares with the main action a common question of law or fact." Hassan meets this standard because he has constitutional claims that share common questions of law with the pending appeals.

For the foregoing reasons, on behalf of Hassan, we respectfully ask the Court to grant this motion to intervene in these consolidated appeals.

November 4, 2013      **JON B. EISENBERG**

**REPRIEVE**
 CORI CRIDER
 CLIVE STAFFORD SMITH
 TARA MURRAY


By: _____/s/_____
         Jon B. Eisenberg

Attorneys for Petitioners and Appellants
**SHAKER AAMER, AHMED BELBACHA, NABIL HADJARAB & ABU WA'EL (JIHAD) DHIAB**, and for Proposed Intervenor **IMAD ABDULLAH HASSAN**

# DECLARATION OF CLIVE A. STAFFORD SMITH

I, Clive Stafford Smith, hereby declare under 28 U.S.C. § 1746:

1. I am the founder and Director of Reprieve, a not-for-profit human rights organization based in London.

2. I am counsel to Imad Abdullah Hassan (ISN 680) in the above-captioned matter. Mr. Hassan wishes to join in the challenge to force feeding to preserve his rights.

3. I met with Mr. Hassan for the first time in Guantánamo on October 23, 2013. He had been asking me to take his case on for several months, because he felt that his voice was not being heard. My notes of that meeting have just been unclassified.

4. My impression of Mr. Hassan is that he is a very principled person. Mr. Hassan's father died in 2005. "I loved him twice," he said to me on October 23. "Both as my father, and because he taught me honor, passion, and love."

5. During his time in Guantánamo Bay, Mr. Hassan has read some of the words of Martin Luther King. He described to me how MLK said that African-Americans have "never been patient in the true sense". This is because silence was forced on them because they were physically

4

shackled by the system. Mr. Hassan states that he feels in a very similar position in Guantánamo Bay to the African-American and, to the extent that the African-American had to struggle peacefully for change, and that some African-Americans had to make huge sacrifices to help their race, so he feels that he is duty bound to do the same.

6. Mr. Hassan is on hunger strike and is being force fed against his will. He does not want to die. However, he does want to be respected as a human being and he is willing—if necessary—to make the ultimate sacrifice of his own life if that will only make the point, for himself and others, that he should be treated with a modicum of respect. His basic complaint is that he and many other prisoners are cleared and yet remain in Guantánamo, and that others are being held indefinitely without charges. He noted to me that his most fundamental complaint—that all the detainees in Guantánamo who have been cleared should be released from the prison—cannot be considered unreasonable since President Barack Obama himself apparently agrees with Mr. Hassan (and goes even further, saying that Guantánamo Bay should be closed).

7. Indeed, Mr. Hassan has been cleared for several years, and yet he is not allowed to go home to Yemen. From my own investigation, it

seems that he has a very good point. I cannot go into details with the classified evidence, of course, but I have found no reliable evidence to suggest that he was ever in Afghanistan, let alone involved in the war there against the United States. Mr. Hassan has never been charged with any offense. There is no prospect that he ever will be charged with any offense.

8. Mr. Hassan started being tube fed during the hunger strike of 2005. He stopped the strike on one occasion for a few months but was back on strike by 2007, and has continued, with only occasional pauses for religious reasons, since that time.

9. As a result, Mr. Hassan remembers the time when the authorities seem to have intentionally made the process of force feeding even more painful. Until late 2005 or early 2006, Mr. Hassan related to me, the authorities used to put a tube in the men who were being force fed, and leave it in, sometimes for weeks. I know this to be true, as I saw at least one of my clients (Shaker Aamer) with the tube up his nose during a visit in 2005.

10. Mr. Hassan's recollection is corroborated by a contemporary article in the New York Times that included an interview with General

Bantz Craddock, who was then in charge of SouthCom—the region with jurisdiction over Guantánamo Bay. The article stated the following:

11. General Craddock said he had reviewed the use of the restraint chairs, as had senior officials at the Department of Defense, and they concluded that the practice was "not inhumane." General Craddock left no doubt, however, that commanders had decided to try to make life less comfortable for the hunger strikers, and that the measures were seen as successful.

> "Pretty soon it wasn't convenient, and they decided it wasn't worth it," he said of the hunger strikers. "A lot of the detainees said: 'I don't want to put up with this. This is too much of a hassle.'"

See Eric Schmitt & Tim Golden, *Force-Feeding at Guantánamo Is Now Acknowledged,* New York Times, Feb. 22, 2006, http://www.nytimes.com/2006/02/22/international/middleeast/22gitmo.html?_r=0.

12. General Craddock essentially conceded that the change in policy was made to make it less "convenient"—his euphemism for being "more painful"—for prisoners to engage in a non-violent protest.

13. Unsurprisingly, perhaps, the detainees took to referring to the force feeding chair as the "torture chair." Indeed, since that time, the

authorities have taken various steps that make the hunger strike process even more difficult and painful, in what Mr. Hassan sees as an effort to "break" the prisoners and end the strike.

14. The authorities have continued to use liquid nutrient to which Mr. Hassan seems to be allergic, even though he has constantly asked and then demanded that they change it back to what he used to have before. Mr. Hassan regularly gets a fever as a result of his force feeding. His temperature does not normally rise too high, but he feels physically very ill. The symptoms always come with the force feeding liquid. He has reached the point where he is scared of food and the force feeding process.

15. The authorities now force the food into Mr. Hassan faster than they used to, despite the fact that this makes him nauseous. He takes both nausea medication and pain medication but still finds the whole process extremely unpleasant—every day.

16. As a result, Mr. Hassan has recently been left to vomit on himself. Sometimes, almost as fast as the food is forced into him, he regurgitates it: "Sometimes I sit in the chair and vomit," he said when we met on October 23. "Nobody says anything. Even if they turned their

backs I would understand. I'm looking for humans. All I ask is basic human rights."

17. One time relatively recently Mr. Hassan found that he was vomiting blood. He found he could not talk, he could not walk, all he could do was curl into the foetal position and moan.

18. Mr. Hassan has a very difficult time with the medical staff. He feels he cannot trust them as they play a very large role in what he views as his daily torture. "In Yemen, we always referred to the doctor as the Angel of Mercy," Mr. Hassan said to me on October 23. "Here, sad to say, I tend to see a doctor as the Angel of Death."

19. During his prolonged hunger strike, Mr. Hassan has been at the edge of death three times, causing him both great mental and physical trauma. He gave me some of the details, though we had limited time and, without either his medical records or the chance to double check things with him, I would not be confident that I have got all the details right. Additionally, he is hampered in reporting what happened by the fact that the Guantánamo medical staff often do not give him the results of his own medical tests.

20.    One time, he reports, he developed a very painful infection in the esophagus and stomach.  He got very ill and almost died.  When he was recuperating, the force feeding caused him to relapse.  They began to force feed him just a small dose of Ensure, with no water, but pancreatitis set in.  After that, for a while they used a catheter to feed him through the right chest.  There were three lines—for feed, for medication and to take his blood.  When they began to take blood it felt very wrong, and Mr. Hassan brought it to their attention.  The doctor said he had made a mistake putting the catheter on the right side.  They had to remove it, and put it in the left side.

21.    One of his stays in hospital was particularly difficult.  He was isolated, without books or access to television, for some 37 days.  At one point, he was told, his fever reached 105 degrees.  He was given a pain killer (he thinks he was told it was Demerol) but he felt almost no effect. "I could not open my eyes," he told me on October 23. "I was in the foetal position, moaning."

22.    The pain made him scream. "I wanted to pick up the bed, I was in such pain.  I was strapped down." On this occasion, he apparently stopped breathing.  They injected him with some other drugs, and it was

several hours before he regained consciousness.  He had apparently been given an overdose of some drug, or he had had an adverse reaction to it. They would not tell him what his medical problem had been, but he had apparently been given another injection to break the drug down in his body.

23.    There is a long list of other reasons why Mr. Hassan feels that his peaceful protest is being demeaned—and why, therefore, he feels that he must stand by his principles.  For example, Mr. Hassan has been punished for what he is doing.  He reports that he has been placed on disciplinary status for at least seven months for taking part in the hunger strike.  This involves losing most or all of the "'privileges" or "comfort items" that are given in the prison.

24.    Mr. Hassan had no intestinal problems before he was detained by the US.  Now he has terrible—and sometimes life threatening—problems.

25.    Mr. Hassan has other long term medical problems.  Some of these make his force feeding increasingly painful.  For example, putting the tube in and pulling it out is now much harder even than it used to be. Mr. Hassan's left nostril is sometimes totally closed now.  His right nostril

has significant sinus problems.  For example, he told me that on the evening of October 22 (just before our visit) it was very hard to get the tube in.  They used his right nostril, but it was a new nurse who made it go in the wrong way so that it went into his mouth.  It was, he reported, extremely painful.

26.    He is also perpetually in danger of falling and always feels dizzy.  "I must be careful," he reported to me on October 23.  "In August I was told I was 83 lbs. and it was worse.  I get dizzy even praying.  My legs are very weak now, and I twisted them praying."

27.    Mr. Hassan suffers greatly from the temperature.  When I met him, it was warm outside (perhaps 80 degrees) and no colder than 70 degrees in the cell where we met.  Nevertheless, he was wearing five tops and three pairs of pants.

28.    As of October 23, Mr. Hassan stated that he thinks he is currently 86 lbs.  While I had no means to weigh him, this was consistent with what I saw when I visited him.

29.    The authorities have been doing what they refer to as "scrotum searches" again in what Mr. Hassan believes to be a conscious effort to prevent him and others from meeting with their lawyers, or taking legal

12

phone calls, and revealing the information concerning the hunger strikes. Mr. Hassan reports that the "scrotum searches" are currently being done even for moves within Camp VI, although they are only being used for external moves with detainees in Camp V.

30.    In my recent experience, a number of the prisoners are refusing legal calls and even legal visits because of these "scrotum searches." Mr. Hassan indicated to me that he had undergone a "scrotum search" on the morning of his visit with me on October 23. He elected to go through it because he knew I had come briefly to Guantánamo to see him and just one other prisoner. However, he reported to me that many prisoners are refusing visits because of this. (Indeed, two lawyers with me had come all the way to Guantánamo with an expensive translator to see two prisoners over two days, and did not get to see either prisoner.)

31.    Mr. Hassan concluded our discussion by giving me a letter that he had written, elaborating on the moral principles that guide his desire to peaceably protest his detention:

> The first lesson I learned here was: the oppression is dark and foreboding. God described himself as judge of justice and he will judge everyone by justice, even the unobedient. The second lesson: tyrants seek to cover their mistakes by another mistake, or a war.

13

Today, the American government [is making] a huge mistake with us. I didn't say they did it yesterday or three, seven, or ten years ago! That is in the past. They could have been confused, or blind, or lacked understanding, and I would not have blamed them. Perhaps it's not easy for anyone who never felt the stinging darts of 9/11 to understand. I truly do understand. But that is a long time in the past, and I think it is time to correct this mistakes.

If not now, when?!

We all make mistakes. There is no shame in that. But an ongoing mistake is a [true] mistake. I demand the US society to correct the mistake it is making every day here. And not only for us—for themselves, their kids, and the next generation. When [the kids] ask about Guantánamo, and how the US government behaved in this case, what will they say? They demolished the great principles that your forefathers, the founding fathers, built the United States of America on. Am I right?

What happened in the past does not relieve you from your responsibility for the present. And the problem is unsolved. We exist in Guantánamo. No one can deny that we *exist*. No one.

Mr. Hassan asked me to have him added to the litigation challenging force feeding as a matter of urgency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  November 2, 2013

Clive A. Stafford Smith
Louisiana Bar No. 14444
Reprieve
PO Box 72054
London EC3P 3BZ
United Kingdom
+44 207 553 8140 (ph.)
+44 207 553 8189 (fax)
e-mail: clive@reprieve.org.uk

# CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Signature: s/ Jon B. Eisenberg